(Not for publication)                                    (Docket Nos. 22, 23, 24)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| ZORAIDA RIVERA, | : |
| | : |
| Plaintiff, | :  Civil No. 04-2449 (RBK) |
| | : |
| v. | :  **OPINION** |
| | : |
| CHERRY HILL CONVALESCENT | : |
| CENTER, INC., | : |
| | : |
| Defendant. | : |
| | : |

**KUGLER**, District Judge:

This matter comes before the Court upon the parties' cross-motions for summary judgment on Count II of Plaintiff Zoraida Rivera's Complaint. Count II of the Complaint alleges that Defendant Cherry Hill Convalescent Center unlawfully terminated Plaintiff's employment in violation of a clear mandate of public policy. The other counts in the Complaint have been previously dismissed pursuant to the Plaintiff's request. For the reasons set forth below, the Court will grant Defendant's motion for summary judgment on Count II and deny Plaintiff's motion for summary judgment on Count II.

## I. BACKGROUND

Defendant Cherry Hill Convalescent Center, Inc. ("CHCC") is a nursing home facility located in Cherry Hill, New Jersey, which provides nursing services and long term care to the elderly. Plaintiff Zoraida Rivera ("Rivera") is a former employee of CHCC, who worked for the

Defendant as a Certified Nurses' Aide ("CNA").  Although CHCC hired and then fired or replaced Rivera on three separate occasions between 1998 and 2003, the current lawsuit relates only to the September 2003 termination of Rivera's employment with CHCC.  Rivera's third and final term of employment with CHCC lasted from November 14, 2000 until September 22, 2003.

CHCC has a Personnel Policy which sets forth CHCC's absenteeism and tardiness policies.  The Personnel Policy in effect in September 2003 provides that "two or more unexcused absences, or three or more latenesses in a 30 day period will result in immediate disciplinary action." (See Personnel Policy, Addendum 2, at Def. Exhibit G.)  An absence is considered unexcused if the absence occurs without the prior approval of the employee's department head, or without accrued sick time. (Id.)  The Personnel Policy also provides that employees must notify their department head or immediate supervisor of an intended absence at least two hours prior to the start of their shift. (Id.)  However, this required act of "calling out" does not in itself constitute an excuse for the absence. (Id.)

In addition to the Personnel Policy, CHCC also had an Amended Policy on absenteeism and tardiness in effect in September 2003.  The Amended Policy provides progressive penalties for violations of CHCC's attendance policies. (See Signed Absenteeism/Tardiness Policies, at Def. Exhibit I.)   If an employee has two absences within a thirty day period, the employee receives a verbal warning. (Id.)  Thereafter, any second offense results in a written warning, and a third offense results in a final written warning. (Id.)  Upon a fourth offense, the employee is terminated. (Id.)  However, if an employee has one "no call/no show"[1] absence, the immediate penalty is a final, written warning. (Id.)  Upon the second occurrence of such a "no call/no show"

---

[1]A "no call/no show" absence is when an employee not only fails to show up for work, but also fails to advise CHCC in advance that he or she will not be coming to work. (See Response to Interrogatory #3, at Def. Exhibit VV.)

absence, the employee is terminated. (See Signed Absenteeism/Tardiness Policies, at Def.

Exhibit I.)  Rivera signed a copy of this Amended Policy on two occasions--once on December

20, 2000 and a second time on an unknown date. (See id.)

      In August 2003, CHCC strengthened the enforcement of its attendance policies.  At that

time, CHCC filled all of its shifts with the CNAs who had the best time and attendance records.

(Dooling Dep., 27:4 to 27:10.)  The remaining CNAs were terminated.  According to CHCC's

Administrator, Michael Dooling, there were a number of CNAs who were close to being

terminated because of their poor time and attendance records, but nevertheless remained on staff

because of CHCC's personnel requirements. (Dooling Dep., 27:11 to 27:15.)  Rivera was one of

these borderline employees. (Dooling Dep., 42:19 to 43:4.)  During a meeting in August 2003,

Dooling advised the CNAs who remained on staff that they would receive an hourly pay

increase; however, in exchange for the higher pay, CHCC was instituting a zero tolerance

approach toward any future violations of the attendance policies.  The employees were given

final warnings on their time and attendance problems. (Dooling Dep. 27:15 to 28:11.)  In

addition, Dooling spoke individually to five CNAs who had the worst attendance records,

including Rivera, and further explained to them that CHCC would be watching them closely for

any future time and attendance problems. (Dooling Dep. 27:15 to 28:11).  Rivera deposed that

she understood the zero tolerance approach and the final warning to mean that if she had another

attendance violation, she would lose her job. (Rivera Dep. 118:20 to 119:3.)

      Shortly after Mr. Dooling's meeting with Rivera and the other CNAs, Rivera called out of

work on Sunday, September 14, 2003.  The Daily Call-Out Report noted that the reason for her

call out was because her son was sick. (See Call Out Report, at Def. Exhibit TT.)

      A few days later, on Friday, September 19, 2003, Rivera called out from work again.  The

Exception Report for that day provides that Rivera called out because "schools closed, no babysitter." (Exception Report, at Dep. Exhibits in Def. Exhibit D.)  Rivera deposed that she did not go to work that day because her children's school was closed due to a State of Emergency and she did not have enough time to find a babysitter. (Rivera Dep., 88:3 to 88:12.)  Rivera could not recall, however, whether she asked her children's father to watch her kids that day, and she admitted that she made no other efforts to find child care. (Rivera Dep., 90:14 to 92:20.)

The following Monday, September 22, 2003, Rivera returned to work at CHCC.  A few minutes after reporting to her floor, Mr. Dooling approached Rivera and handed her a termination letter. (See Rivera Dep., 94:18 to 95:2.)  CHCC fired Rivera for calling out twice within a five-day period. (See Termination Letter, at Dep. Exhibits in Def. Exhibit D; Dooling Dep., 26:11 to 26:13.)  Dooling testified that he called Rivera into his office and terminated her for violating the attendance policy after receiving a final warning regarding her attendance record. (See Dooling Dep., 40:2 to 40:10.)  Although Rivera explained that she missed work on September 19, 2003 because schools were closed due to a state of emergency and she did not have a babysitter, Dooling responded that her reason was unacceptable. (Dooling Dep., 40:13 to 40:14.)

Several months later, on May 26, 2004, Rivera filed a Complaint against CHCC in this Court.  The Complaint originally contained claims pursuant to (1) the New Jersey Family Leave Act ("NJFLA"), 34 N.J. Stat. Ann. 34:11B-1 to 34:11B-16, (2) the Family Medical Leave Act ("FMLA"), 29 U.S.C. §2601, et seq., and (3) public policy.  In October 2005, CHCC filed a motion for summary judgment on all claims in the Complaint[2] and Rivera filed a motion for

---

[2]CHCC also filed a motion requesting permission to file an overlong brief.  At the time CHCC filed its motion for summary judgment, Counts I and III of the Complaint had not yet been dismissed and the Defendant required more pages to address all three claims.  Therefore,

summary judgment as to the public policy claim only.  On December 13, 2005, the Court

dismissed the NJFLA and FMLA claims pursuant to Rivera's request for voluntary dismissal

under Federal Rule of Civil Procedure 41(a)(2).  Therefore, the only claim left in this matter is

the public policy claim, which is the subject of the current summary judgment motions.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue

of material fact exists only if "the evidence is such that a reasonable jury could find for the

nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving

for summary judgment. Celotex, 477 U.S. at 330. The moving party may satisfy this burden by

either (1) submitting affirmative evidence that negates an essential element of the nonmoving

party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is

insufficient to establish an essential element of the nonmoving party's case. Id. at 331. Once the

moving party satisfies this initial burden, the nonmoving party "must set forth specific facts

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving

party must "do more than simply show that there is some metaphysical doubt as to material

facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III.  DISCUSSION

In her motion papers, Rivera argues that CHCC's act of terminating her employment

---

the Court will allow the overlong brief to stand, even though the only claim now remaining in the
case is Count II.

violated public policy for two reasons.  First, she relies upon New Jersey's Civil Defense and

Disaster Control Act ("CDDCA"), N.J. Stat. Ann. App. A:9-30, <u>et seq.</u>, which empowers the

Governor to declare a state of emergency to provide for the welfare of the state of New Jersey.

Rivera claims that CHCC's act of terminating her employment because she had to miss work due

to a state of emergency caused harm to her family's welfare, which is contrary to the public

policy set forth in the CDDCA. (<u>See</u> Pl. Mem. at 8.)  Second, Rivera contends that CHCC's

refusal to allow her to miss work to look after her children violates the clear mandate of public

policy set forth in N.J. Stat. Ann. § 9:6-3, <u>et seq.</u>, a statute which generally prohibits child abuse,

cruelty, and neglect. (Pl. Mem. at 9.)

By contrast, CHCC claims it is entitled to summary judgment on Rivera's public policy

claim because there is no clear mandate of public policy against CHCC's termination decision.

CHCC argues that the State of Emergency Order issued on September 18, 2003 has no relation to

Rivera and her responsibility to report to work on September 19, 2003. (Def. Opp. at 9.)

Furthermore, CHCC argues that Rivera's reliance on the state laws against child abuse and

neglect is misplaced in this context.  CHCC contends that the evidence shows that Rivera did not

even try to make alternative child care arrangements on September 19, 2003 before calling out

for work, even though she knew that her absence would be grounds for termination. (Def. Opp. at

12.)  The Court will address these arguments in turn.

**A.  Wrongful Termination in Violation of a Clear Mandate of Public Policy**

In New Jersey, an at-will employee has a cause of action for wrongful termination when

the discharge is contrary to a clear mandate of public policy. <u>Pierce v. Ortho Pharmaceutical</u>

<u>Corp.</u>, 417 A.2d 505, 512 (N.J. 1980); <u>see</u> <u>MacDougall v. Weichert</u>, 677 A.2d 162, 168 (N.J.

1996) (noting that an employee must "show that the retaliation is based on the employee's

exercise of certain established rights, violating a clear mandate of public policy.")  Sources of

public policy include legislation; administrative rules, regulations or decisions; and judicial

decisions. Pierce, 417 A.2d at 512. The relevant public policy at issue must be "clearly identified

and firmly grounded . . . . A vague, controversial, unsettled, and otherwise problematic public

policy does not constitute a clear mandate." MacDougall, 677 A.2d 167.  Unless the at-will

employee articulates a clear, specific expression of public policy against his/her termination, that

employee may be discharged with or without cause.  Pierce, 417 A.2d 512.  Whether an

employee has established the existence of a relevant, clear mandate of public policy is an issue of

law. Mehlmann v. Mobil Oil Corp., 707 A.2d 1000, 1012 (N.J. 1998).

Moreover, to be actionable, the termination decision at issue must pose a "threat of public

harm, not merely private harm or harm only to the aggrieved employee." Id. at 1013.  By

definition, public policy is a principal that operates to prevent persons from lawfully acting to

injure the public or the public good. Id. at 1012 (citation omitted).

### 1.  New Jersey's Civil Defense and Disaster Control Act

The Plaintiff argues that her termination violated the public policy in favor of protecting

the public welfare, which is set forth in the CDDCA.  One of the purposes behind the CDDCA is

to "provide for the health, safety and welfare of the people of the State of New Jersey" during an

"emergency."[3] N.J. Stat. Ann. App. A:9-33. The  CDDCA grants the Governor broad discretion

to control all civilian activities having to do with the emergency and to prescribe a course of

---

[3]An "emergency" for purposes of the CDDCA includes a "disaster" or a "war
emergency." N.J. Stat. Ann. App. A:9-33.1(4).  A "disaster" is defined as "any unusual incident
resulting from natural or unnatural causes which endangers the health, safety, or resources of the
residents of one or more municipalities of the State, and which is or may become too large in
scope or unusual in type to be handled in its entirety by regular municipal operating services." Id.
App. A:9-33.1(2).  A "war emergency" is "any disaster occurring anywhere within the State as
the result of an enemy attack or the imminent danger thereof." Id. App. A:9-33.1(3).

conduct for the civilian population during the emergency. Id. App. A:9-33, 9-34.  Moreover, the

CDDCA prohibits civilians from committing "unauthorized or otherwise unlawful act[s]" during

the "threat or imminence of danger in any emergency that jeopardizes the health, welfare and

safety of the people." Id. App. A:9-49.

       Pursuant to the CDDCA, the Governor of New Jersey declared a state of emergency

beginning at 4:00 p.m. on September 18, 2003 and ending at 6:00 p.m. on September 19, 2003.

(See Executive Order # 68, attached as Def. Exhibit H.)  The emergency related to potentially

severe weather conditions expected to be caused by Hurricane Isabel.  In the Executive Order

declaring the emergency, the Governor (1) ordered members of the New Jersey National Guard

to active duty; (2) ordered the State Director of Emergency Management to implement the State

Emergency Operations Plan; (3) ordered the State Director of Emergency Management and the

Attorney General to determine and control the flow of vehicular traffic on interstate, state,

municipal or county roads, including the right to detour, reroute or divert traffic as may be

necessary; (4) and ordered the evacuation of civilians where necessary and the provision of

temporary shelter for the evacuees. (See Executive Order #68, at Def. Exhibit H.)

       Although the CDDCA grants the Governor broad authority in an emergency to protect the

public safety, health and welfare, the CDDCA does not establish a clear mandate of public policy

prohibiting private employers from requiring at-will employees to come to work during a state of

emergency like the one declared on September 18, 2003.  First, the Executive Order establishing

the state of emergency at issue here did not prohibit travel, nor did it order closure of public

schools or private business. See Executive Order #68, attached as Def. Exhibit H; see also N.J.

Stat. Ann. App. A:9-45 (granting the Governor discretion to restrict the vehicles and persons

permitted to travel during an emergency if necessary). Therefore, CHCC's expectation that

Rivera report to work on September 19, 2003 was not a violation of the Governor's action plan as set forth in Executive Order No. 68.

Second, although the CDDCA prohibits unlawful acts that threaten the public safety or welfare during an emergency, there is no authority to suggest that terminating an employee who misses two days of work within a five day period is an unlawful act, even if one of those days is during a State of Emergency similar to the one declared on September 18, 2003.  In fact, the minimal case law that Plaintiff cites in support of her position is factually distinguishable from this case, non-binding on this Court, and has nothing to do with the CDDCA or any policies enumerated therein. See Shick v. Shirey, 716 A.2d 1231 (Pa. 1998) (a non-binding Pennsylvania case finding that it is a violation of public policy to terminate an at-will employee for filing a workers' compensation claim); Reuther v. Fowler & Williams, Inc., 386 A.2d 119 (Pa. 1978) (another non-binding Pennsylvania case standing for the proposition that it is against public policy to terminate an employee who misses work to attend jury duty because "trial by jury is fundamental to the American scheme of justice"); Mamlin v. Genoe, 17 A.2d 407 (Pa. 1941) (another non-binding Pennsylvania case finding no clear mandate of public policy to support an exemption from attachment for benefits payable by beneficial societies because there was no statute addressing the issue).  Moreover, the Court has not found any other New Jersey case law that might support the Plaintiff's interpretation of the CDDCA in a similar context.

Third, there is no evidence that Rivera's termination had any potential effect on the public welfare, as opposed to Plaintiff's own personal loss.  Rivera argues that CHCC's termination decision "caused harm to her and her children's welfare, which is contrary to the public policy set forth in the CDDCA." (Pl. Mem. at 8.)  Clearly, any termination has the potential to cause some harm to the terminated employee and/or her family; however, it is equally clear that a termination

does not violate public policy just because the adverse action has a negative consequence for the aggrieved employee. See Mehlmann, 707 A.2d 1013.  Rather, to state a claim for wrongful discharge in violation of a clear mandate of public policy, Rivera must demonstrate that her termination poses a threat of public harm.  Rivera has failed to articulate specifically the public harm that CHCC's termination decision might pose.[4]  As a result, she cannot prevail on her public policy claim.

Altogether, Rivera has failed to demonstrate that her termination violated a clear mandate of public policy set forth in the CDDCA.  Neither the language of the statute itself nor any case law interpreting the statute suggests that it is a violation of public policy for an employer to terminate an at-will employee under the circumstances present here.  As a result, the Court will grant Defendant's motion for summary judgment as to Plaintiff's claim that her termination violated a public policy established by the CDDCA.

2. New Jersey's Statute Against Child Abuse, Neglect, Abandonment and Cruelty

In addition to the CDDCA, Rivera also relies upon New Jersey's law against cruelty, abuse, abandonment, and neglect of children as a basis for her public policy claim.  In New

_____

[4] Although the Plaintiff does not clearly state a threat to public welfare, one can infer from her motion that a potential threat might consist of requiring employees to travel to work in treacherous conditions during a State of Emergency.  However, in this case, there is no indication that the driving conditions were prohibitively treacherous, as all the other CNAs on the schedule made it to work on September 19, 2003, and the Governor did not prohibit travel plans in his Order declaring a State of Emergency.  (See Tilton Dep. at 55:17 to 56:9; Executive Order No. 68, at Def. Exhibit H.)  Moreover, Edward Tilton, CHCC's Director of Nursing, deposed that in the event the roads are dangerous, the National Guard would pick up CHCC employees and drive them safely to work. (Tilton Dep. at 36:18 to 37:2.)  Because the patients in the nursing home require constant care regardless of the weather, missing work is not a viable option. (Tilton Dep. at 36:18 to 36:24.)

Moreover, it is clear that the reason for Rivera's termination was not merely that she missed work during a State of Emergency on September 19, 2003, but rather, she missed two days of work within a five day period in violation of CHCC's attendance policy. (See Termination Notice, at Deposition Exhibits in Def. Exhibit B.)

Jersey, it is a crime of the fourth degree for any "parent, guardian or person having the care, custody or control of any child" to "abuse, abandon, be cruel to or neglectful of such child." N.J. Stat. Ann. § 9:6-3.  It is likewise a fourth degree crime for "any person" to "abuse, be cruel to or neglectful of any child." Id.  The statute defines "neglect" as "willfully failing to provide proper and sufficient food, clothing, maintenance, regular school education as required by law, medical attendance or surgical treatment, and a clean and proper home" or "failure to do or permit to be done any act necessary for the child's physical or moral well-being." Id. § 9:6-1.  In addition, abandonment includes "willfully forsaking a child" or "failing to care for and keep the control and custody of a child so that the child shall be exposed to physical or moral risk without proper and sufficient protection." Id.  The provisions of this statute are to be liberally construed to ensure that "the best interests of children be promoted and that the safety of children be of paramount concern." N.J. Stat. Ann. § 9:3-37; see New Jersey Div. of Youth & Family Services v. H.B., 866 A.2d 1053, 1072 (N.J. Super. Ct. App. Div. 2005) (stating that the overarching public policy running through Title 9 is "protecting our children from those who would do them harm"); In re Estate of Thomas, No. A-4320-02T2, 2004 WL 943629, *37 n.7 (N.J. Super. Ct. App. Div. May 3, 2004) (noting that New Jersey has a strong public policy in favor of the protection of children).

Rivera argues that these statutes against child neglect and abandonment create a clear mandate of public policy against mistreatment of children, which CHCC allegedly violated when it refused to excuse Rivera's absence on September 19, 2003. (Pl. Mem. at 9.)  In other words, CHCC purportedly violated public policy by requiring Rivera to choose between going to work and leaving her children home alone, on the one hand, and staying home to watch her children and losing her job, on the other hand.  Rivera also emphasizes that she did not have sufficient

time to find a babysitter because the State of Emergency was "obviously" an unexpected situation. (Pl. Mem. at 9.)  Plaintiff further contends that there was no unreasonable burden placed on CHCC due to Rivera's absence on September 19, 2003 because there purportedly was a pool of 20 nursing assistants who were off duty and potentially available to replace Rivera on that day. (Pl. Mem. at 9.)

By contrast, CHCC argues that Rivera's termination was lawful and in accordance with its attendance policies.  After receiving a final warning regarding her poor attendance record, Rivera violated CHCC's attendance policies by missing two days of work within a five day period. (Def. Opp. at 13.)  CHCC points out that, at the time, Rivera knew that any further attendance infractions would jeopardize her job, yet she still violated the policy.  Moreover, CHCC contends that Rivera misrepresents the facts in arguing that she did not have any time to find a babysitter.  The State of Emergency went into effect at 4:00 p.m. on September 18, which means that Rivera had nearly twelve hours to make alternative child care plans for September 19, 2003. (Def. Opp. at 12.)  In addition, Rivera deposed that she made no efforts to find a babysitter, and did not ask the children's father or any other individual to watch the children. (Pl. Dep. at 90:14 to 90:18.)  Finally, CHCC argues that there is no record evidence to support Plaintiff's assertion that there were others to replace her on her September 19, 2003 shift; however, even if there were replacements, the Defendant submits that it is irrelevant whether CHCC was burdened by Rivera's absences.  (Def. Opp. at 13.)  In other words, CHCC's position is that Rivera lost her job for failing to show up to work.

Although neither party provides any case law on whether it is a violation of public policy to terminate an at-will employee who misses a scheduled shift to stay home with her children, the Court has found a few similar cases from other jurisdictions.  See e.g., Upton v. JWP

Businessland, 682 N.E.2d 1357 (Mass. 1997); Lloyd v. AMF Bowling Centers, Inc., 985 P.2d

629 (Ariz. Ct. App. 1999).  In Upton, the plaintiff, a single mother, took a job with the defendant

with the understanding that she would work from 8:15 a.m. to 5:30 p.m. Upton, 682 N.E.2d at

1358.  When the defendant subsequently informed her that she would have to work until 9 or 10

p.m each evening for at least several months, the plaintiff told the employer that her parenting

obligations prevented her form working such long hours. Id.  She was discharged two weeks

later. Id.  The plaintiff then filed a suit claiming wrongful discharge and argued that meeting the

defendant's demands regarding work hours would cause her to neglect her child in contravention

of public policy. Id. at 1359.  In rejecting her claim, the court found that "there is no public

policy which mandates that an employer must adjust its expectations, based on a case-by-case

analysis of an at-will employee's domestic circumstances, or face liability for having discharged

the employee." Id. at 1360.

Likewise, in Lloyd, the court found that there was no violation of public policy where an

employer terminated an employee who refused to come to work because he did not have anyone

to babysit his young son. See Lloyd, 985 P.2d at 632.  In Lloyd, the employer unexpectedly asked

the plaintiff to work an unscheduled shift because another employee went home sick. Id. at 630.

The plaintiff was unable to work the extra shift because he had no one else to watch his four year

old son. Id.  The employer then terminated the plaintiff for failing to work the extra hours. Id.

The plaintiff claimed his termination violated public policy because the employer's demands

would have required him to leave his children unattended, thereby committing a crime pursuant

to Arizona's law against child abuse and neglect. Id. at 630-31.  The court rejected the plaintiff's

public policy claim, finding that:

No public policy prohibits employers from calling at will employees and

> expecting them to appear at work, and then terminating them if they do not.
> Lloyd would have us focus on the employee's reasons for not performing a lawful
> act in deciding the case. But that is neither required nor appropriate . . . . So long
> as the act required by the employer is a lawful act, the employee's reasons for not
> performing the act, however reasonable, are immaterial.

Lloyd, 985 P.2d at 632.  In other words, the Court ruled that because unexpectedly requiring an

employee to come in to work does not constitute a wrongful act, terminating an at-will employee

for failure to do so is not a violation of public policy. Id.

> By contrast, the dissent in Lloyd framed the issue differently.  Judge Kleinschmidt noted:
>
> In my opinion, the majority's conclusion that the employer required nothing more
> than that the employee report for work, a lawful and permissible act under the
> terms of the employment, ignores the reality of the situation.  The employer's
> directions to Lloyd necessarily required Lloyd to commit the unlawful act of
> neglecting his children.  To fire him for refusing to do so would be against public
> policy.

Id. at 632-33.  However, the dissent also noted that his view of the plaintiff's right not to be fired

depended on the narrow circumstances of that particular case. Id. at 633.  Specifically, the dissent

relied on the fact that there was no understanding that plaintiff was to stand on-call for other

employees; therefore, the employer's last minute request for him to cover for another employee

was not something that plaintiff should have anticipated and planned for accordingly. Id. That is,

the dissent did "not suggest that the employer could not fire an on-call employee who does not

have a contingent plan for child care, or could not fire an employee who does not make adequate

provision for child care during normal working hours." Lloyd, 985 P.2d at 633.

> Although these cases are clearly non-binding adjudications from other jurisdictions, the

Court finds their reasoning to be applicable to the facts of the present matter.  Similar to the

plaintiffs in Lloyd and Upton, Rivera has not shown that it is a violation of public policy for an

employer to terminate an at-will employee who fails to work her scheduled shifts.  In this case, it

is undisputed that (1) Rivera knew in advance that she was scheduled to work on September 19, 2003; (2) Rivera knew a day in advance that her children's school would likely be closed on September 19, 2003; (3) Rivera knew at the time that another call out would jeopardize her job; and (4) Rivera nevertheless chose not to make any efforts to find child care for her children for September 19, 2003. Based on these facts, Rivera's termination did not violate public policy. CHCC required an at-will employee to work a scheduled shift, and then terminated her because her failure to do so constituted her second absence in five days in violation of CHCC's attendance policy. CHCC's requirement that Rivera report to work was not a requirement that Rivera leave her children home alone, because Rivera had some advance notice that she would need child care during her shift on September 19, 2003. Under these circumstances, the employer should not be responsible for an employee's choice not to seek child care for the employee's normal working hours. Consequently, the Court finds that CHCC should not be held liable for wrongful discharge and will grant Defendant's motion for summary judgment on Plaintiff's claim that her termination violated a public policy relating to New Jersey's laws against child abuse, neglect, or abandonment.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant Defendant's motion for summary judgment on Count II of the Complaint and will deny Plaintiff's motion for summary judgment on Count II of the Complaint. The accompanying Order shall issue today.

Dated:   5-17-06                                    s/ Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge